May it please the Court, Devin Burstein on behalf of Mr. Igboanugo. Your Honors, on remand from this Court's prior decision vacating Mr. Igboanugo's sentence, the District Court committed two additional errors in its relevant conduct finding. First, it applied the wrong standard of proof in holding Mr. Igboanugo responsible for all losses beyond the counts of conviction, because that was the tail that wagged the dog. It had a disproportionate impact, and therefore, under HIMAS, and I know, Judge Smith, you were on that panel, under HIMAS, the Court needed to apply the heightened clear and convincing standard. Second, under any standard, the District Court erred in holding Mr. Igboanugo responsible for the lottery scheme losses. Well, you do agree, do you not, Counsel, that under our case law, and for that matter, Supreme Court case law, that a two-level enhancement is not an exceptional circumstance, and you don't need to have a clear and convincing standard of proof. Do you agree with that? I do. So what our argument about today is, what happens with a 12-year period, is that the appropriate, that's where you get everything all together, and whether the Judge was right about that. When I think Your Honors said 12-year, do you mean the 12-level? I'm sorry. That's what I thought Your Honor meant, exactly. Yeah, that's correct. 12-level. And that's the first thing I actually wanted to start with. I want to dispel any misconceptions that, in terms of the burden of proof argument, that applies to all losses beyond the counts of conviction. That's our argument, and HIMAS is very clear on that point. What HIMAS says is, we are going to divide the losses in a fraud case into two categories. We're going to look first at the losses admitted in the counts of conviction. Then, for uncharged or acquitted or non-convicted conduct, we're going to look at those losses. And if those losses have a disproportionate impact on the sentence, we're going to say the district court had to apply the clear and convincing standard. Here, the counts of conviction, the three counts, have a total loss value of approximately $6,000. We know that the relevant conduct losses have a $600,000-plus value. Though that money was not admitted to, he was not ever held accountable, in terms of the factual basis, for any money beyond the $6,000. Therefore, we feel that we fit directly under HIMAS's instruction that for the remaining $600,000-plus total loss figure, the heightened clear and convincing standard was required. That said, even if the Court were to disagree, and now I'll transition, unless the Court has questions about the standard of proof. The only question, and it's really more a question of is this correct, my understanding is that your client has conceded that the lottery scheme losses only, in quotes, resulted in an additional two-level increase. Is that correct?  Okay. That's the $6,000. That we have as a given, right? Exactly. So that's the $6,000. And in the the calculations get a little bit confusing, but I can point the Court to page 32 of the opening brief, footnote 15. I try and lay those calculations out, deriving from the $6,000. I go point by point through the guidelines calculations. I guess I'm unclear how you're lining it up with the Ninth Circuit precedent about the 12th Circuit, 12th level jump. Yes, Your Honor. I know. I know. Bear with me. I fully understand, Your Honor. So what HIMAS says is we're going to divide the losses into two categories, counts of conviction, relevant conduct. In this case, counts of conviction, the three counts have very small dollar amounts. They lead to a grand total of $6,045. Mr. Igbo Inugo was held responsible for not $6,045. Under the relevant conduct, under 1B1 analysis, the District Court held him accountable for over $600,000. So under HIMAS, everything beyond that initial $6,000 from the three counts of conviction, so the remaining $600,000 plus, $1,000, to make that determination to hold Mr. Igbo Inugo responsible for that amount, whatever that is, a hundredfold increase, that would have been a clear and convincing standard under HIMAS. I'm confused by your argument today because you're not up here on appeal for the first time. So on the last go-around, you appealed the loss calculation as well, right? The scope of a remand, as I understood it, was for the District Court to determine whether the relevant conduct included the lottery scheme. Now you're arguing as if the case is up here for the first time. No, Your Honor. Respectfully, I'm not arguing as if it's up here for the first time. And my colleague, I think, does a good job in her brief of merging the issues, and I'm doing my best to separate them. The actual amount, that is the dollar figure, was not sent back. And I agree. And we're not contesting the dollar figure. The dollar figure doesn't matter. It only matters to the extent he was held responsible for it. That was the tail that wagged the dog, I'm sorry to say. So your argument is that the relevant conduct, which in this case, I assume, would be the District Judge's findings about the fact that they live at the same house, two perpetrators live in the same house, they use the same computers, he spoke to them on the phone at least 166 times in 2008, et cetera, et cetera. That's relevant conduct. Your question is did it meet clear and convincing standards. Is that right? Can I give you a sort of answer? The answer is truly sort of. I hate to not answer yes or no, but the answer is truly sort of. And this is, candidly, this is the problem with relevant conduct to begin with. This gets confusing. So our first argument is under Hymus to hold him responsible, and I see I'm getting close to my three minutes here, but under Hymus to hold him responsible for any of the losses above the $600,000, not to calculate that amount. Above the $600,000 or above the $6,000? Sorry, the $6,000. Years, dollars, whatever. Levels. Yes, it's all, it's a mess. But to hold him responsible for that under Hymus, not the, Judge Winn, not the dollar amount. I agree with you. That is what it is. The spreadsheet says what it says, and this Court previously found that number responsible. But the number is only one part. You know, the more salient part is not how much, but is he responsible for that. We can agree that Mr. Cyril, the co-defendant, he's responsible for that. But the question is, is Mr. Igbo Inugo responsible for that over and above the $6,000? Now, the second part, going back, is that answered your question at all? Sort of. And I apologize. But let's assume that you're right, that it's clear and convincing.  Right, Your Honor. That under that standard, the other scheme, the lottery scheme, shouldn't be counted as relevant conduct. Going through all of the evidence that Judge Smith recounted, why isn't that enough? Right. And in this context, I think it's a little bit like when we learned about multiplying any number by zero, right? Any number multiplied by zero is zero. That's my last math reference. Speculation is the same thing, right? Speculation multiplied by speculation doesn't get you evidence that's reliable. It doesn't get you even preponderance of the evidence. Speculation times speculation just equals speculation. And that's what we have here. But there's such a thing as circumstantial evidence. I mean, it's really, really difficult to conceive of the fact that when you look at the similarity of the scheme, the fact that the computers were in the home, the fact that they were involved with each other, the co-defendants or the co-conspirators said that they operated the lottery scheme with others. The number of contact between your client and the others is just, it's hard to conceive that he didn't know about the lottery scheme as well. Well, let me, I understand that point. But let me tell you that there's equally, I would say, if not more, circumstantial evidence going the other way. Because we know that evidence is not just affirmative evidence. Evidence is also a lack of evidence. So I would like to talk a little bit about the lack of evidence. Do you want to save any of your time, Mr. Burstein? Well, I'd like to answer Judge Williams' question. Oh, you can. Up to you. I mean, I don't think if I sat down right now I'd... Go ahead. The lack of evidence. What's your best case? So let's talk about the lack of evidence here. So first of all, that he lived in the house, we would then imagine that if he was involved in this lottery scheme, not just the secret shopper, there'd be some affirmative evidence of it. Something found in his room. Maybe the postal inspector could tie him to a computer that had lottery scheme evidence on it. There's nothing. There's no dominion in control. I thought, I thought that on the computers there was evidence of both schemes and both parties having used it. No, Your Honor. That's the key. And I'm glad you brought it up because there isn't. The district court specifically asked Inspector Gonzales if he can link Mr. Igbo Inugo and he says, she says, excuse me, I cannot. Now, she was able to link Cyril or not she because this all happened in Canada. The Canadian authorities were able to essentially link Cyril to one computer. And then my friend made the argument that, well, if Cyril's linked to one, shouldn't we just assume that Mr. Igbo Inugo used the other? Well, no, because there's no evidence of it. That, we need evidence. This court has made clear that in the Mesa Stake Jesus case cited in our brief, preponderance of the evidence is a meaningful standard. It means that you have to be convinced that of the fact of the proposition and the fact that you live with somebody, well, that's guilt by proximity, guilt by association. Why, if the question the Court would ask is why would Mr. Igbo Inugo so passionately and repeatedly deny any involvement in the lottery scheme? Why would the first prosecutor, not my friend here, go out of her way to tell the district court, we're not putting anything in the factual basis about the lottery in the court? No, we appreciate your able advocacy, Mr. Burstein. You're a terrific lawyer, but you're out of time. Thank you, Your Honor. I understand. Thank you for the extra time. Thank you very much. We'll hear from the government. Good morning, Your Honors. May it please the Court. Ella Manson on behalf of the United States. I have listened to my learned opponent's arguments, and despite all the issues raised for the Court today, there is really only one critical question that matters to the resolution of this appeal, and that is, was the district court required to use a different standard than it did when it found defendant was responsible for the lottery scam losses as relevant conduct? The answer is no for two reasons. First, all the conduct at issue in this case was part of one common scheme, and I'll explain why. And second, the losses from the lottery part of the scheme only added two levels, and as my friend has agreed, that never requires a clear and convincing evidence standard. Now, even though defendant did not plead guilty to the lottery part of the scheme, it was appropriate for the Court to find it as relevant conduct. The secret shopper pitch and the lottery pitch were two fraudulent devices used in the same scheme to defraud. The only difference between the conduct that the defendant pled to and the relevant conduct was the initial pitch. In every other way, it's clear they were part of the same scheme. Same actors, same time frame, same physical location, same recipient of payment, same means of communication, same type of victim. Counsel, let me just interrupt you for just one second because I want to get something clear about the computer, which is part of what you're talking about. At ER 344, I show the district court found that, in quotes, two computers, and then a little brief here, which contained information and documents that reflect use by those persons of those computers to perpetrate the lotto and the shopper scheme. Was the judge referring to the defendant in this case and the other non-defendant in this case? Is that correct? Yes, Your Honor, and I can describe what was in front of the Court in that respect. Please. So the evidence is clear that both of these pitches of this single scheme were operating out of the same shared house in Canada where both defendant and co-defendant Cyril lived. Now, when investigators executed a search warrant on November 25th in 2009 at 730 in the morning, what they found was defendant and Cyril in the house, and upstairs at the top of the stairs there was an open area that was essentially set up as a boiler room, and in that area they found two laptop computers, a USB drive, a scanner, a shredder, a black and white printer, a color printer, rubber gloves, paper, envelopes, and 1,600 pages of check stock in various colors. Now, on one of the printer trays there were 97 secret shopper letters addressed to potential victims. On the other printer tray were 97 fraudulent checks addressed to those same victims. On the floor were the envelopes to package the secret shopper letters and the checks to be sent out. On one of the USB drives there was the scan of the original victim's check that had been fraudulently altered to create these 97 checks, and in a box under the oven there was a lottery scam letter inside one of the envelopes in a set of envelopes. Now, computers are very important here, I agree with you, and on those computers, the only two laptops in this boiler room area where we know the defendants were operating together on these schemes, there was one computer that could be linked to Cyril by IP logins to his email, and on that computer there was a lead list with names and contact information for victims, there was a news article about con artists using MoneyGram, and there was information related to a secret shopper victim, the same victim that had actually been noticed in the trash poll from November 12th and November 19th. On the other computer, which the court made the reasonable inference that this would be the computer the defendant was using, as there's two fraudsters and two computers, there were numerous files related to forged checks, there were lead lists of individuals in the United States, there was secret shopper form letters, and the customer service survey documents that the secret shoppers were told to fill out after wiring their money. So am I understanding correctly that there was evidence of both schemes on both computers? The evidence was that one computer was linked to Cyril by IP login, and there were evidence of secret shopper scheme on that computer, and the other computer, which the reasonable inference is was the computer the defendant would be using, had evidence not only of the secret shopper scheme, but also it had three lottery scam letters, including one from August 2017, telling a victim they'd won $120,000, and that this was a check for $3,800 that they could send, they could use to wire money for their certificate of clearance and their non-resident transit fee. So there's evidence of both the secret shopper scheme and the lottery scheme on the computer that was inferred to be used by the defendant. Counsel, forgive me, does the record reflect any evidence of fingerprints or DNA taken from the keys of the computers? No, Your Honor, and the rubber gloves were inferred to be the reason why there was not. But again, the only difference between these... So for the defendant to prevail, essentially it's the theory that what ties them together is the secret shopper scheme, but unbeknownst to the defendant, or at least without his participation, the co-conspirators operated the lottery scheme alone. Exactly, and I think the court found very persuasive the fact that the other co-schemers in this operation had pled guilty to both pitches. So Cyril pled guilty to both the secret shopper and the lottery scheme, and co-schemer Asieru, who had been indicted in a separate case, pled to both as well. And that is why the contacts with Asieru were so important here, because defendant's contacts with Asieru, in terms of the money grant transactions that he picked up, were earlier and far more frequent. He began picking up money grant transactions from co-schemer Asieru in January 2008, whereas Cyril's first pickup was in November 2008. Defendant picked up 55 money grant transactions from Asieru, Cyril picked up seven. Defendant talked to Asieru 166 times on the phone, Cyril talked to him 97. So it can't be argued that Cyril was the lottery guy and defendant was the secret shopper guy, because Cyril pled to both, and defendant had much more frequent contact. How much weight did the court put on the fact that the defendant spoke with Cyril 166 times in 2008? By phone. Yeah, I think that the court is clear that that's something that was considered in the finding that this was relevant conduct. And again, these schemes, the only difference was the pitch. The words coming out of the fraudster's mouth were either congratulations, you've won the lottery, or congratulations, you've been selected to be a secret shopper. Everyone received a letter, everyone was told to call a claim representative, everyone was told when they called to wire money, everyone's money was intercepted by a co-schemer and then forwarded on to defendant and co-defendant. The only difference was the pitch here. And the difference between the conduct the defendant pled to, which was the scheme, and the relevant conduct, that's all there was, was the initial pitch. So I think given all of the evidence that the court had in front of it, it was not illogical, it was not implausible, and it was not without support in the record to find that this was relevant conduct. Now, if I can transition to the argument that Hymas controls here, I strongly disagree. Hymas is a very different case, and as Your Honor knows, being on that panel, the court focused on the factual basis in the plea agreement. And when you line up the factual basis in the plea agreement in Hymas, which is in the record, with defendant's second motion for judicial notice at 4, and you look at the factual basis that defendant pled to,  the difference is striking. And it's clear in Hymas that the issue they had was that defendant had not pled to a scheme. They said, quoting, That's at 1291 in Hymas. But here, that's exactly what this defendant did. He had a factual basis which spanned January 2007 to November 2009. The factual basis is written as a continuing course of conduct. It says defendant would do this, defendant would do that, in many instances this, in some instances this, in virtually every instance that. It's clear that the court asked the defendant four times in the change of plea to affirm that he accepted the allegations in the factual basis. It was interpreted for him. There was a recess. There was consultation with standby counsel. In conclusion, defendant has had two bites at the apple. This is the fair result. This is the just result. This below-guidelines sentence, twice imposed, is the result of a correct guidelines calculation and a sentence that was imposed to equalize this defendant with co-defendant's serial, and a sentence that the court expressly said did not adequately capture the harm to the victims. I think you're out of time. I am. And I would just ask that you affirm. Thanks, both counsel. And do we have your assurances that no one in the U.S. Attorney's Office bought on either scheme? Oh. They sent the money back. How can she represent that? Okay. Thanks to both counsel. We appreciate your excellent arguments. The case just argued is submitted.
judges: Motz, M. Smith, Nguyen